### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BERNARD PITTERMAN, et al., | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:14-CV-00967 (JCH) |
| | : | |
| v. | : | |
| | : | |
| GENERAL MOTORS LLC, | : | APRIL 29, 2016 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 59); MOTION TO PRECLUDE EXPERT TESTIMONY OF SGT. MICHAEL R. O'BRIEN (DOC. NO. 63); MOTION TO PRECLUDE PRIMARY EXPERT TESTIMONY OF L. WAYNE McCRACKEN, JR. (DOC. NO. 65); MOTION TO STRIKE PLAINTIFFS' EXHIBIT O (ECF 95-15) ON SUMMARY JUDGMENT MOTION (DOC. NO. 103)**

## I.      INTRODUCTION

This case arises out of events that occurred on July 13, 2011, when M.R.O, an 8-year-old child, died in connection with an automobile accident involving a 2004 Chevrolet Suburban, which is manufactured by the defendant General Motors LLC ("GM").  The plaintiffs in this case are: (1) Bernard Pitterman, as administrator of the Estate of M.R.O.; (2) Bernard Pitterman, as guardian of the Estate of G.O., who is the victim's brother; and, (3) Rose O'Connor, who is the victim's mother (plaintiffs will be referred to, collectively, as "Pitterman").

The initial Complaint (Doc. No. 1) ("Compl.") was filed in Connecticut state court and subsequently timely removed by GM.  See Notice of Removal (Doc. No. 1).  On October 5, 2015, Pitterman filed a six-count Amended Complaint (Doc. No. 88) ("Am. Compl.").  Pitterman subsequently withdrew Counts 4, 5, and 6 of the Amended

Complaint.[1]  The three remaining counts – one per plaintiff – allege that GM violated C.G.S.A. §§ 52-572m et seq., by distributing the 2004 Suburban in a defective condition and by not providing adequate instructions or warnings regarding the alleged defect.

Pitterman seeks to introduce expert testimony from Detective Sergeant Michael R. O'Brien of the Brookfield Police Department, who Pitterman asserts is an expert is the field of "Accident Investigation / Reconstruction."  See Affidavit of Paul E.D. Darsow Ex. N (Doc. No. 62-14).  Pitterman also seeks to introduce expert testimony from L. Wayne McCracken, Jr., an engineer who would testify "with respect to his reconstruction of the collision and his opinions regarding the design and function of the Brake Transmission Shift Interlock on the [2004 Suburban]."  Id. Ex. Q (Doc. No. 62-17).

GM has moved to exclude both O'Brien and McCracken's expert testimony.  See Motion of GM to Exclude Expert Testimony by Detective Sergeant Michael R. O'Brien (Doc. No. 63); GM's Motion to Exclude Primary Expert Testimony by L. Wayne McCracken, Jr. (Doc. No. 65).  GM has also moved for summary judgment as to all of Pitterman's claims.  See Motion for Summary Judgment (Doc. No. 59).

## II.    FACTUAL BACKGROUND[2]

Although a case's underlying facts generally play a significant role in the court's assessment of a Motion for Summary Judgment, this case presents a somewhat

---

[1] Both the Complaint and the Amended Complaint identified James O'Connor, who was M.R.O.'s father, as a plaintiff.  However, James O'Connor was only a party to Counts 5 and 6 of the Amended Complaint.  See Am. Compl. at 7-8.  Because the court granted Pitterman's Motion to Withdraw Counts 4, 5, and 6 of the Amended Complaint (Doc. No. 113), see Doc. No. 115, James O'Connor is no longer a party to this case.

[2] In connection with a motion for summary judgment, the court relies on the undisputed facts or, if a fact is disputed, the court views the evidence in the light most favorable to the party opposing summary judgment.  Except where noted, the facts are not in dispute.

unusual situation in which there are numerous facts in dispute, none of which impacts the court's resolution of GM's Motion for Summary Judgment.  This is because GM's Motion for Summary Judgment rests on its assertion that O'Brien and McCracken's expert testimony is inadmissible, see GM's Memorandum in Support of Its Motion for Summary Judgment (Doc. No. 61) ("GM's MFSJ Mem. in Supp."), which is a question of law.  See Fed. R. Evid. 104(a); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); Strauss v. Credit Lyonnais, S.A., 925 F.Supp.2d 414, 437 (E.D.N.Y. 2013) ("Federal Rule of Evidence 104(a) provides that the admissibility of expert testimony is a preliminary question of law for the court to determine").  GM argues that, if the expert testimony proffered by Pitterman is inadmissible, Pitterman will be, as a matter of law, incapable of proving "the product defect and causation elements of [his] product liability claims."  GM's MFSJ Mem. in Supp. at 2.  Pitterman, on the other hand, argues that expert testimony is not required to prove his product liability claims and that, even if expert testimony is required, both O'Brien and McCracken's testimony is admissible. See Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment at 1 (Doc. No. 95) ("Pls.' MFSJ Opp'n").

The following facts are relevant to the instant Ruling.  O'Brien was the officer placed "in charge of the investigation into M.R.O.'s death."  GM's Local Rule 56(a)(1) Statement ¶ 69 (Doc. No. 60) ("GM's L.R. 56(a)(1) Stmt."); see also Plaintiffs' Local Rule 56(a)(2) Statement ¶ 69 (Doc. No. 96) ("Pls.' L.R. 56(a)(2) Stmt.").  O'Brien authored a "Supplemental Report" in which he concluded what was the "most likely scenario" in the incident that resulted in M.R.O.'s death.  See Affidavit of Paul E.D. Darsow Ex. M at 4 (Doc. No. 62-13) ("O'Brien Report").

McCracken authored two reports, the latter of which amended and supplemented his original report.  See id. Ex. Q (Doc. No. 62-17) ("McCracken Report"); id. Ex. R (Doc. No. 62-18) ("Am. McCracken Report").  The Amended McCracken Report is divided into two sections: "Accident Reconstruction" (henceforth referred to as the "causation opinion") and "Brake Shift Interlock"[3] (henceforth referred to as the "product defect opinion").  Neither of McCracken's Reports touches on or includes opinions regarding the adequacy of any warnings GM might have provided about the allegedly defective condition.  See GM's L.R. 56(a)(1) Stmt. ¶ 93; see also Pls.' L.R. 56(a)(2) Stmt. ¶ 93.

## III.   LEGAL STANDARD

### A.   Motion for Summary Judgment

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present such evidence as would allow a jury to find in his favor, see Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Graham, 230 F.3d at 38.  Summary judgment "is properly granted

---

[3] The "brake shift interlock" is also referred to as the "brake transmission shift interlock" ("BTSI"). In accordance with the parties' practice, the court will use BTSI.

only when no rational finder of fact could find in favor of the non-moving party."  Carlton

v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons,

applying the proper legal standards, could differ in their responses to the question"

raised, on the basis of the evidence presented, the question must be left to the finder of

fact.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

> B.  Motion to Exclude Expert Testimony

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Supreme Court has articulated four factors courts may look to

when assessing the reliability of an expert: (1) "whether a theory or technique . . . can

be (and has been) tested"; (2) "whether a theory or technique has been subjected to

peer review and publication"; (3) "the known or potential rate of error" of a technique;

and, (4) the "general acceptance" of a theory within the "relevant scientific community."

Daubert, 509 U.S. at 593-94.  However, these factors "do not constitute a definitive

checklist or test."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999)

(emphasis in the original).  Rather, the court's "gatekeeping inquiry must be tied to the

facts of a particular case," and "the factors identified in Daubert may or may not be

pertinent in assessing reliability, depending on the nature of the issue, the expert's

particular expertise, and the subject of the testimony."  Id. (internal quotation marks and

citations omitted).

IV.     **DISCUSSION**

    A.  Motion to Exclude O'Brien's Expert Testimony

GM seeks to exclude O'Brien's testimony because it is unreliable.  See Memorandum in Support of GM's Motion to Exclude Expert Testimony by Detective Sergeant Michael R. O'Brien at 5-8 (Doc. No. 64) ("GM's O'Brien Mem. in Supp.").  At the outset, the court notes that O'Brien, as a member of an accident investigation team, has investigated and written reports on hundreds of, if not over a thousand, accidents. See Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Expert Testimony of Detective Sergeant Michael O'Brien Ex. A at 13:3-10 (Doc. No. 93-1) ("O'Brien Dep.").  He has also received specialized training in investigating motor vehicle accident scenes and on writing accident reports.  See id. at 13:17-14:1. Although GM disputes the reliability of O'Brien's report, and any testimony based on the report, GM does not argue that O'Brien is unqualified to serve as an expert in the field of accident investigations.  Nor does GM argue that the process O'Brien undertook to investigate and report on the accident in this case differed in any way from the process O'Brien has used for the hundreds of other investigations he has conducted and reports he has written.

Rather, GM argues that O'Brien's testimony is unreliable because there "is too great an analytical gap between the data and the opinion proffered."  GM's O'Brien Mem. in Supp. at 4 (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  This "analytical gap" is too great, GM argues, because O'Brien, inter alia: (1) did not interview G.O.; (2) assumed, rather than concluding based on measurements, that M.R.O. could not reach the brake pedal; and, (3) assumed that M.R.O. did not turn on

the engine, without adequately considering the possibility that she did turn on the engine.  See id. at 5-8.  GM does not argue that any single one of these alleged deficiencies renders O'Brien's testimony inadmissible, but rather that the cumulative effect of these deficiencies renders O'Brien's report and testimony unreliable.  See generally id.

With regard to the first alleged deficiency, O'Brien admits that he did not interview G.O. as part of his investigation.  See O'Brien Dep. at 45:12-14.  This is relevant, GM asserts, because the therapist who met with G.O. after the accident wrote in her notes that G.O. told her that, in an effort to aid M.R.O turn on the car, he " 'got on the floor to release the brake and get to the pedals.' "  See Affidavit of Paul E.D. Darsow Ex. P at 28:2-29:11 (Doc. No. 62-16) ("Fleming-Sherman Dep.").  O'Brien has testified that he was unaware of G.O.'s comments and that, if he had been alerted to those comments while he was writing his report, he "would have considered some further possibilities" as to what caused the victim's death.  See O'Brien Dep. at 46:1-12.  Pitterman argues that the fact that O'Brien was not aware of G.O.'s conversation with the therapist until after O'Brien finished his report "goes to the weight the jury may place on [O'Brien's] testimony," rather than to its admissibility.  Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Expert Testimony of Detective Sergeant Michael O'Brien at 7 (Doc. No. 93) ("Pls.' O'Brien Mem. in Opp'n").

With regard to the second alleged deficiency, Pitterman does not claim that O'Brien actually measured the length of M.R.O.'s legs as part of his investigation.  Rather, Pitterman argues that O'Brien's failure to measure the length of M.R.O.'s legs does not disqualify him from concluding that she would not have been able to reach the

brake because O'Brien "had an opportunity to view the interior of the Suburban and an opportunity to view [the victim's] body." Id. at 6.  Further, Pitterman argues that GM's expert also did not measure the length of M.R.O.'s legs, but rather "relied on anthropomorphic data regarding 8 year old children" to conclude that the victim could have reached the brake pedal. Id.  In so noting, Pitterman implicitly argues that, because GM's expert also did not take an actual measurement of M.R.O.'s legs, O'Brien's failure to take such a measurement cannot be viewed as a deficiency in his investigative methodology. See id.

With regard to the third alleged deficiency, Pitterman argues that GM mischaracterizes O'Brien's Report and his deposition testimony by claiming that he "assumed" that M.R.O. only turned the key to the Accessory position and did not turn the engine on. See id. at 4.  Rather, Pitterman argues that O'Brien "conclude[d]" that M.R.O. only turned the key to the Accessory position. Id. at 5.  In his report, O'Brien noted, based on photographs and another officer's report, "that the automatic transmission was in 'Neutral' and the keys were in the 'on' position, without the engine running (the key had been turned enough to turn on the electrics, but not all the way so as to start the engine.)"  O'Brien Report at 2.  Although O'Brien uses the phrase " 'on' position," his description corresponds to the "Accessory" position.  O'Brien's Report also notes that he tested two other Suburbans and found that, when the key was in the Accessory position, the transmission could be shifted without application of the brake. See id. at 3.  He also notes in the Report that, based upon his research, if the engine of the 2004 Suburban were on, then the transmission could not be shifted unless the brake was pressed. See id.  O'Brien proceeds to conclude that the "most likely scenario" in

8

this case was that M.R.O. turned the keys to the Accessory position and, while standing or sitting in the front seat, "inadvertently pulled the lever to move the transmission from Park to Neutral." Id. at 4.

In his deposition, O'Brien testified that he considered the possibility that M.R.O. had turned the engine on and then off, but that he ultimately "didn't think it was probable or possible" that she did so. O'Brien Dep. at 42:15-19. When asked why he did not think it was possible that M.R.O. turned the engine on, O'Brien replied that his conclusion was driven by the fact that she "wouldn't have been able to reach the brake." Id. at 42:20-22. Later in his deposition, O'Brien agreed that, in the 2004 Suburban, one could start the engine without being able to reach the brake. See id. at 44:20-22. O'Brien also testified that part of the reason he did not think M.R.O. turned the engine on was because M.R.O.'s mother told him that she did not believe that M.R.O. was actually going to turn the engine on, even though M.R.O. had told her mother that, "she was going to start the car." See id. at 44:9-19.

GM seizes on O'Brien's reliance on M.R.O.'s inability to reach the brake as indicative of O'Brien's faulty reasoning, as one need not press the brake in order to turn on the engine of the 2004 Suburban. See GM's O'Brien Mem. in Supp. at 6-7. Pitterman, however, argues that O'Brien did not dismiss the possibility that M.R.O. turned the engine on solely on the basis of his earlier conclusion that she could not reach the brake. Rather, Pitterman argues that O'Brien's conclusion that M.R.O. only turned the key to the Accessory position was derived from a combination of three facts: (1) that M.R.O. could not reach the brake; (2) that if the engine had been turned on, one would need to press the brake in order to shift the transmission from Park to Neutral;

and, (3) that the key was found in the Accessory position.  See Pls.' O'Brien Mem. in

Opp'n at 7.  Thus, because O'Brien concluded that the transmission was shifted from

Park to Neutral, and because he concluded that M.R.O. could not reach the brake, he

concluded that the transmission must have been shifted without application of the

brake, which can only occur if the key is in the Accessory position and cannot occur if

the engine has been turned on.

Upon review of O'Brien's Report and his deposition testimony, the court

concludes that, because O'Brien's Report is based on sufficient facts / data, because

his report is the product of the same methods O'Brien has used in countless other

accident investigations (which methods GM does not challenge), and because O'Brien

applied his methods reliably to the facts of this case, O'Brien may testify as an expert

and provide his opinion as to what the "most likely scenario" surrounding the accident

was.  The court does not believe that O'Brien's failure to measure M.R.O.'s legs and his

failure to interview G.O. render his report so unreliable as to disqualify him from

testifying.  Rather, the court believes that these omissions go to the weight of O'Brien's

testimony, which GM will be to attack on cross-examination.[4]  GM's Motion to Exclude

---

[4] The court does not believe that either Wills v. Amerada Hess Corp., 379 F.3d 32 (2d Cir. 2003) or Perkins v. Origin Medystems, Inc., 299 F.Supp.2d 45 (D. Conn. 2004), both of which GM has cited in support, requires a different conclusion.  In Wills, the proposed causation expert "conceded that cigarette smoking and alcohol consumption were major risk factors for the development of squamous cell carcinoma," the illness in question, yet "fail[ed] to account for decedent's smoking habit and alcohol consumption as possible causes of decedent's squamous cell carcinoma."  Wills, 379 F.3d at 50.  In Perkins, the court admitted the expert's testimony after noting that, "[a]lthough an expert is not required to eliminate every potential cause in order for his or her opinion to be admissible under Daubert, the expert is required to employ either standard diagnostic techniques to eliminate obvious alternative causes or, if the defendant suggests some likely alternative cause of the plaintiff's condition, the expert is required to offer a reasonable explanation why he or she still believes that the defendant's action or product was a substantial factor in bringing about the plaintiff's condition."  Perkins, 299 F.Supp. 2d at 61.
In the case at bar, G.O.'s involvement in the events preceding the accident was not the type of "obvious alternative cause" that is contemplated in Wills or Perkins.  GM has not suggested any reason why O'Brien would or should have been on notice of G.O.'s possible involvement while he was

10

O'Brien's testimony is denied.

B. <u>Motion to Exclude McCracken's Expert Testimony</u>

The Amended McCracken Report contains two sections, which are independent of one another.  Accordingly, the court will address the causation opinion and the product defection opinion separately.

1. <u>Product defect opinion</u>

GM argues that the court should preclude McCracken's product defect opinion because it is "contrary to applicable legal standards."  Memorandum in Support of GM's Motion to Exclude Primary Expert Testimony by L. Wayne McCracken Jr. at 6 (Doc. No. 66) ("GM's McCracken Mem. in Supp.").  It is "contrary to applicable legal standards," GM claims, because "it is inconsistent with Connecticut's substantive product liability law."  <u>Id.</u> at 7.  Specifically, GM claims that McCracken's conclusion – as characterized by GM – that "emerging technology in motor vehicle design renders defective all vehicles which do not have the technology," is contrary to "Connecticut's substantive product liability law."  <u>Id.</u>  Assuming, <u>arguendo</u>, that such a view were contrary to Connecticut product liability law,[5] GM's argument fails because McCracken's product defect opinion does not stand for the proposition that GM claims it does.

_____

conducting his investigation.  To the contrary, O'Brien testified that he had been told that G.O. was outside the car and had tried to run after the car as it rolled backwards.  <u>See</u> O'Brien Dep. at 44:23-45:2.

The record also indicates that O'Brien did not ignore the "obvious alternative cause" of the rollaway: that M.R.O. turned the engine on, depressed the brake, and shifted the car into neutral, before ultimately turning the key back to the Accessory position.  Rather, he considered this possibility but concluded that it was not possible or probable. While GM is entitled to attack O'Brien's conclusion on cross-examination, there is no ground to exclude O'Brien's testimony on the basis that he did not consider this possibility.

[5] GM has not cited a single Connecticut state court case, or a single case from a federal court within the Second Circuit, that stands for that proposition.

Nowhere in his product defect opinion does McCracken claim that the 2004 Suburban was defective solely on the basis that new technology was emerging, or has subsequently emerged, that could have made the 2004 model safer.  Rather, McCracken concludes that the 2004 Suburban was defective because earlier versions of GM automobiles, including the 2002 Suburban, contained a BTSI function that was active in the Accessory ignition position and, because the automobile industry was, by 2004, "aware that serious injuries and fatalities occurred as a result of children shifting the transmission from park to neutral when a vehicle is parked on a slanted surface and the vehicle then rolls away injuring or killing a child inside or outside the vehicle."  Am. McCracken Report at 7.

Further, GM's argument is not advanced by the two cases that GM cites in support.  Those cases stand for the proposition that it is inappropriate to apply modern sensibilities and notions of safety to products that were created in an earlier era.  See Robinson v. Brandtjen & Kluge, Inc., 500 F.3d 691, 694-95 (8th Cir. 2007); Sexton By and Through Sexton v. Bell Helmets, Inc., 926 F.2d 331, 336-37 (4th Cir. 1991). Rather, "[t]o determine what was defective in an earlier period, we look to evidence of the industry practice at the time, any direct evidence of what reasonable purchasers expected, and other evidence concerning injuries or knowledge of the dangers of the product in that time."  Robinson at 695.  There is nothing in McCracken's product defect opinion that indicates he applied latter-day sensibilities or notions of safety to 2004, when the Suburban in question was distributed.  Rather, his opinion indicates that his conclusion that the 2004 Suburban was defective is based on industry knowledge and capabilities that existed in 2004.  See Am. McCracken Report at 7-8.  Therefore,

McCracken's product defect opinion is not precluded on the ground that it is contrary to Connecticut substantive product liability law.

GM also argues that McCracken's product defect opinion should be precluded because it "conflicts with applicable federal law." GM's McCracken Mem. in Supp. at 7. GM concedes that it "does not argue that federal law preempts Plaintiffs' state law claims." GM's Reply to Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Primary Expert Testimony by L. Wayne McCracken, Jr. at 3 (Doc. No. 107) ("GM's McCracken Reply") (emphasis in original). Rather, it argues that, because federal regulations in place in 2004 did not require that automobiles include a BTSI function that is active in all ignition positions, "[p]ermitting McCracken to opine that a vehicle becomes defective the moment one perceives a way to change its design conflicts with both common law and federal law by extension." Id. at 4. However, as just discussed, the court does not read McCracken's product defect opinion as standing for the proposition that the 2004 Suburban was defective because the industry was starting to perceive at the time, or subsequently perceived, that it could make cars safer by including a BTSI function that is active in all positions. Rather, the court reads McCracken's opinion as standing for the proposition that the 2004 Suburban was defective at the time it was distributed because the industry was aware of the risk of rollaway accidents to children, and because GM had the capability in 2004, at the time it distributed the Suburban in question, of including a BTSI function that was active in all positions.

Finally, GM argues that McCracken's product defect opinion should be excluded because "[t]o the extent McCracken's product defect opinion rests on GM's effort to

13

expand BTSI design and function, it rests on subsequent remedial measures which are inadmissible under Rule 407 of the Federal Rules of Evidence." <u>Id.</u> at 4.  However, with regard to improvements to the BTSI function, McCracken's opinion only references GM's internal discussions from 2003 – which, McCracken states, occurred prior to the production of the 2004 Suburban – regarding making the BTSI active in all positions. <u>See</u> Am. McCracken Report at 8.  Thus, McCracken's product defect opinion is not premised on subsequent remedial measures that GM advocated or took.  Rather, it is, in part, premised on measures that GM had contemplated prior to manufacturing the 2004 Suburban, not subsequent.  Therefore, McCracken's product defect opinion is not excluded on the ground that it is contrary to federal law.[6]

Alternatively, GM argues that McCracken's product defect opinion should be excluded because it is unreliable.  <u>See</u> GM's McCracken Mem. in Supp. at 8-11.  As already discussed, <u>see</u> <u>supra</u>, § III.B, the Supreme Court has articulated four factors courts may look to when assessing the reliability of an expert: (1) "whether a theory or technique . . . can be (and has been) tested"; (2) "whether a theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" of a technique; and, (4) the "general acceptance" of a theory within the "relevant scientific community." <u>Daubert</u>, 509 U.S. at 593-94.  However, these factors "do <u>not</u>

---

[6] The court notes that allowing McCracken to testify will in no way prevent GM from arguing that "its vehicles pass federal muster and [inviting] the jury to conclude that a vehicle that complies with all federal rules is safe enough to be on the road." GM's McCracken Reply at 3 (quoting <u>DePaepe v. Gen. Motors Corp.</u>, 141 F.3d 715, 718 (7th Cir. 1998)).  McCracken's product defect opinion does not claim that the 2004 Suburban was noncompliant with then-applicable federal regulations.

Similarly, allowing McCracken to testify will in no way prevent GM from objecting to trial testimony that is inadmissible under Rule 407 of the Federal Rules of Evidence.  The court's decision to allow McCracken to testify is premised on the conclusion that his product defect opinion, as discussed, is not itself inadmissible under Rule 407.  Of course, if the oral testimony that McCracken, or anyone else, provides at trial is inadmissible under Rule 407, the court will exclude such testimony.

constitute a definitive checklist or test." Kumho Tire, 526 U.S. at 150 (emphasis in the original). Rather, the court's "gatekeeping inquiry must be tied to the facts of a particular case," and "the factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony." Id. (internal quotation marks and citations omitted).

The court reads McCracken's product defect opinion as standing for three distinct opinions: (1) that the automobile industry was aware, by 2004, of the risk posed to children of rollaway accidents when children shift the transmission from park to neutral while the vehicle is parked; (2) that GM was capable of manufacturing the 2004 Suburban with a BTSI function that was active in the Accessory position; and, (3) that GM was capable of retrofitting the 2004 Suburban so as to make the BTSI function active in the Accessory position. The court will assess whether there exists a reliable basis for each of these propositions.

With regard to the first opinion, McCracken's conclusion that the automobile industry was aware of the risk to children of rollaway accidents is premised on the fact that the National Highway Traffic Safety Administration ("NHTSA") published a report in 1990 which highlighted this risk. See Am. McCracken Report at 7. McCracken references this report in his product defect opinion, but he does not reproduce the NHTSA report as part of his opinion. However, Pitterman has included a full copy of the NHTSA report in its briefing. See Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Primary Expert Testimony of L. Wayne McCracken, Jr. Ex. O (Doc. No. 94-15) ("NHTSA Report"). The court has reviewed the NHTSA report and

concludes that it supports the conclusion that McCracken drew from it. See id. at 7 ("Based on the accident data, [NHTSA] concludes that, with respect to the rollaway type of accident, there is a significant enough safety problem, since children are the primary victims of these transmission lever shifting accidents, to justify amending the Standard. NHTSA recognizes the special obligation it has to reduce accidents involving children, and it believes this action is consistent with that obligation"); id. at 18 ("an estimated 400-800 child-injuring rollaway accidents occurring annually, nationwide"). Further, the court agrees with Pitterman that the court can presume that GM was aware of the contents of the 1990 NHTSA report.[7] Accordingly, the court finds that McCracken's opinion that the automobile industry was aware of the risk to children of rollaway accidents is based on sufficient data, is the product of a reliable methodology, and is the result of a reliable application of this methodology to the facts of this case. Therefore, McCracken will not be precluded from testifying about the first opinion.

With regard to the second opinion, McCracken's conclusion that GM was capable of manufacturing the 2004 Suburban with a BTSI function that was active in the Accessory position is based on his review of various discovery materials, interrogatory responses, and deposition testimony. See Am. McCracken Report at 8. In his product defect opinion, he specifically references testimony by Victor Hakim, who is the Department Head / Sr. Technical Consultant in charge of Engineering Analysis for GM. Id. McCracken also references information that he gleaned from GM's responses to interrogatories, although he does not identify which interrogatories he relies upon. Id.

---

[7] Beyond the fact that it is a reasonable inference that GM, as one of the country's largest automobile manufacturers, would be aware of a NHTSA report, the NHTSA actually contacted GM in connection with the publication of the NHTSA Report, which further supports the conclusion that GM was aware of the Report. See NHTSA Report at 8-9.

However, Pitterman has identified specific portions of Hakim's deposition testimony, specific portions of William Sultze's deposition testimony, and specific interrogatory responses, all of which McCracken had access to when drafting his opinion and all of which, Pitterman claims, support McCracken's conclusion.  <u>See</u> Plaintiffs' Memorandum in Opposition to Defendant's Motion to Exclude Primary Expert Testimony of L. Wayne McCracken, Jr. at 17-27 (Doc. No. 94) ("Pls.' McCracken Mem. in Opp'n").  Specifically, McCracken's conclusion that GM was capable of manufacturing the 2004 Suburban with a BTSI function that was active in the Accessory position is based on the following facts: (1) GM had manufactured other cars with a BTSI function that was active in the Accessory position prior to 2004; and, (2) the GM Safety Integration Council decided in September 2003 to make the BTSI function active in all positions.  <u>See</u> Am. McCracken Report at 8.

The court has reviewed the interrogatory responses and the deposition testimony of Hakim and Sultze that Pitterman has provided to the court, and the court concludes that they generally support McCracken's conclusion.  Specifically, in its response to Interrogatory 4, GM acknowledged that "some implementations of BTSI did apply to the accessory key position prior to the date of manufacture of the 2004 Chevrolet Suburban, but not to the implementation used in the 2004 Chevrolet Suburban."  <u>See</u> Pl.'s McCracken Mem. in Opp'n Ex. A at 2 (Doc. No 94-1).  In its response to Interrogatory 9, GM conceded that it would have been feasible to design the 2004 Suburban with a BTSI function that was active in the Accessory position.  <u>See</u> <u>id.</u> Ex. J at 1-2 (Doc. No. 94-10).  Along these lines, Hakim testified that the Geo Prism, a GM car, had a BTSI function that was active in all key positions as of 1990 and 1992.  <u>See</u>

id. Ex. B at 97:23-98:7 (Doc. No. 94-2) ("Hakim Dep.").  Sultze also testified that, as of

2003, there were some GM vehicles that had a BTSI function that was active in all key

positions.  See id. Ex. D at 45:11-14 (Doc. No. 94-4).  Hakim also testified that it was his

belief that GM could have made the BTSI function in all key positions in 2003.  See id.

Ex. P at 46:15-23 (Doc. No. 94-16).

However, the record less clearly supports McCracken's assertion that, "the GM

Safety Integration Council in September 2003 decided to make BTSI active in all key

positions."  Am. McCracken Report. at 8.  Sultze's deposition testimony indicates that, in

September 2003, he made a presentation to the Safety Integration Council in which he

proposed that GM make the BTSI function active in all key positions.  See Plaintiffs'

Memorandum in Opposition to Defendant's Motion for Summary Judgment Ex. C at

29:15-19 (Doc. No. 95-3); see also id. Ex. D (Doc. No. 95-4).  However, the record does

not indicate that the GM Safety Integration Council decided, in September 2003, to

adopt Sultze's proposal and make the BTSI function active in all key positions.

Nevertheless, the court still concludes that McCracken's opinion that GM was capable

of designing the 2004 Suburban with a BTSI function that was active in the Accessory

position is based on sufficient data, is the product of a reliable methodology – i.e.

McCracken's review GM's interrogatory responses, his review of Hakim's deposition

testimony, and his review of Sultze's proposal – and is the result of a reliable application

of this methodology to the facts of this case.  Therefore, McCracken will not be

precluded from testifying about the second opinion.

With regard to the third opinion – that GM could retrofit the 2004 Suburban to

make the BTSI function active in the Accessory position – McCracken does not indicate

in his product defect opinion on what basis he drew that conclusion.  In his briefing,

Pitterman asserts that McCracken, at his deposition, produced an electrical schematic

showing how GM could retrofit the 2004 Suburban to make the BTSI function active in

the Accessory position.  See Pl.'s McCracken Mem. in Opp'n at 18-19; see also id. Ex.

L (Doc. No. 94-12) (McCracken's schematic).  GM argues that McCracken's testimony

on this point is unreliable because McCracken never tested his alternative design, never

subjected it to peer review, and because the rate of error of McCracken's design is

unknown.  See GM's McCracken Mem. in Supp. at 9.  In response, Pitterman argues

that McCracken did not need to test his alternative design because GM, through its

employee Hakim, "has agreed that the design proposed by Mr. McCracken either would

work or could be made to work."  Pl.'s McCracken Mem. in Opp'n at 21.

However, the court does not believe that Hakim unequivocally indicated that

McCracken's alternative design was feasible, as Pitterman claims he did.  Upon

reviewing McCracken's schematic, Hakim did testify that McCracken's redesign would

make the BTSI active in the Accessory position.  See Hakim Dep. at 146:19-21.

However, Hakim went on to testify that he did not know what other effects McCracken's

redesign would have on the 2004 Suburban's other functions, and he specifically stated

that, "[t]his is one of those things you'd actually have to try it and see what other circuits

it interrupts."  Id. at 147:24-148:1.

Although, as discussed earlier, the court is not required to consider the Daubert

factors when assessing an expert's reliability, the Daubert factors are especially

appropriate when the purported expert seeks to testify about a safer alternative design.

See, e.g., Zaremba v. Gen. Motors Corp., 360 F.3d 355, 358-59 (2d Cir. 2004) (applying

<u>Daubert</u> factors to proposed safer alternative design).  Applying the <u>Daubert</u> factors, the court concludes that McCracken did not test his alternative design, did not subject it to peer review, did not calculate its rate of error, and has not indicated that it is generally accepted in the automobile industry.  Thus, the methodology upon which McCracken based his finding that GM was capable of retrofitting the 2004 Suburban, <u>i.e.</u> his alternative design and Hakim's deposition testimony, do not provide a reliable basis for McCracken's conclusion.  Therefore, McCracken will not be permitted to testify about his proposed alternative design or GM's capability of retrofitting the 2004 Suburban to include a BTSI function that was active in the Accessory position.[8]

### 2. Causation opinion

GM seeks to exclude McCracken's causation opinion on the ground that it is unreliable.  <u>See</u> GM's McCracken Mem. in Supp. at 12-13.  McCracken's causation opinion relies on a number of sources: O'Brien's Report; police measurements; deposition testimony; photos of the vehicle and accident scene; his own field investigation of the vehicle and accident scene; his testing of vehicles similar to the 2004 Suburban; and, a report of the download of the Sensing and Diagnostic Module ("SDM") performed on the subject vehicle.  <u>See</u> Am. McCracken Report at 2-7.  GM advances a number of arguments as to why McCracken's causation opinion is unreliable, which the court will address in turn.

---

[8] The court notes that Pitterman correctly points out that he does not need to prove that a safer alternative design existed in order to prevail on his claim that the 2004 Suburban was unreasonably dangerous when it was designed.  <u>See</u> <u>Potter v. Chicago Pneumatic Tool Co.</u>, 241 Conn. 199, 217-219 (1997) ("in some instances, a product may be in a defective condition unreasonably dangerous to the user even though no feasible alternative design is available. In such instances, the manufacturer may be strictly liable for a design defect notwithstanding the fact that there are no safer alternative designs in existence").

First, GM argues that, "McCracken's opinion about what caused the Suburban to roll rests on the same incomplete information available to the Brookfield Police."  GM's McCracken Mem. in Supp. at 12.  However, as already determined, the information available to O'Brien when he wrote his report was sufficient to allow a conclusion to be drawn with regard to the "most likely scenario" surrounding the accident.  It follows, then, that McCracken's reliance on O'Brien's Report, and on the data that O'Brien relied upon when investigating the accident, does not render McCracken's causation opinion unreliable.

GM also argues that McCracken's causation opinion is unreliable because McCracken "has no information as to what M.R.O. may have done with her feet once she entered the Suburban, meaning that McCracken cannot rule out the possibility that M.R.O. operated the vehicle's service brake."  Id. at 12.  However, "[e]xperts are not required to conclusively rule out every possibility."  Adel v. Greensprings of Vermont, Inc., 363 F.Supp.2d 683, 689 (D. Vt. 2005) (citing cases).  Nevertheless, Pitterman argues that McCracken, through his review of Rose O'Connor's deposition testimony, did consider what M.R.O. was doing with her feet.  Pitterman notes that, "McCracken had available to him the deposition testimony of Rose O'Connor in which she testified that G.O. told her that M.R.O. was 'kneeling in the front seat' and G.O. 'was like kneeling on the back and leaning forward between the seats.' "  Pls.' MFSJ Opp'n at 19. GM attempts to undermine the legitimacy of McCracken's reliance on Rose O'Connor's testimony on the ground that Pitterman "offer[s] no explanation for how an accident reconstruction expert can reliably form a causation opinion based on the second-hand hearsay statements of an emotionally traumatized child, as reported by a parent with a

clear motive to slant the facts."  GM's McCracken Reply at 8.  However, GM's

arguments about the credibility of Rose O'Connor's testimony and, concomitantly, of

McCracken's report, speak to the weight of McCracken's causation opinion, not its

admissibility.[9]

     Further, McCracken does consider the possibility that the key had been turned to

the "Run" position (i.e. the position in which the engine is running and application of the

brake is required to shift gears) rather than the Accessory position, and ultimately

concludes based on technical analysis that the key had not been turned to the Run

position.  McCracken bases this conclusion in part on his analysis of the report of the

SDM download.  Specifically, McCracken concludes that, because the "topography of

the accident scene and the nature of damage to the subject vehicle is significant

enough to trigger a near deploy event on an SDM," and because the "[r]eport of SDM

download performed on the subject vehicle showed no event recorded," the SDM on the

subject car must not have been powered when the accident occurred.  See Am.

McCracken Report at 6.  And, because the SDM is powered when the key is in the Run

position, but is not powered when the key is in the Accessory position, McCracken

concludes that the key was in the Accessory position, and not the Run position, at the

time of the rollaway.  Id.  Accordingly, McCracken's causation opinion is not rendered

unreliable for failure to consider the possibility that M.R.O. operated the vehicle's brake.

     Lastly, GM offers a number of critiques of McCracken's causation opinion that

are premised primarily on GM's assertion that McCracken did not consider certain

---

[9] In a similar vein, GM relies on G.O.'s therapist's notes to prove what G.O. said during his
meeting with the therapist.  Just as McCracken's reliance on Rose O'Connor's deposition testimony as
evidence of M.R.O's positioning within the car is subject to attack, so is GM's reliance on the therapist's
notes as evidence of G.O.'s involvement in the events preceding the accident.

possibilities, account for certain facts, or conduct certain tests / calculations.  <u>See</u> GM's McCracken Mem. in Supp. at 12-13.  Some of GM's assertions, such as its assertion that McCracken "fail[ed] to consider the possibility that M.R.O. actually started the vehicle," <u>id.</u> at 12, and its assertion that McCracken "[d]id not attempt to explain how the vehicle's driver's side door came to be open," <u>id.</u> at 13, are patently rebuked by McCracken's causation opinion, <u>see</u> Am. McCracken Report at ¶¶ 8 (door), 9-10 (starting the vehicle).  As for GM's assertion that McCracken did not plot the car's travel path or trajectory, or calculate its speed as it rolled, beyond stating that McCracken did not conduct these analyses, GM does not articulate how such analyses would be relevant to McCracken's causation analysis, nor does it articulate how McCracken's causation opinion is, on account of these omissions, faulty.  Further, GM does not cite any case indicating that analyses of a car's travel path, trajectory, or speed are relevant to a causation opinion such as McCracken's, or necessary to render such an opinion reliable.  Accordingly, these omissions are not significant enough to render his causation opinion unreliable.  Rather, they speak to the weight of McCracken's causation opinion, which GM will have the opportunity to undermine on cross-examination.  Thus, GM's Motion to Exclude McCracken's testimony is granted in part, and denied in part.  It is granted to the extent that McCracken will not be permitted to testify about GM's ability to retrofit the 2004 Suburban.  In all other respects, it is denied.

C. Motion for Summary Judgment

      1. Product defect claim

GM argues that, because Pitterman cannot prevail on his product defect claim without expert testimony, and because the expert testimony that Pitterman has proffered is inadmissible, the court should grant its Motion for Summary Judgment. However, because the court has concluded that the expert testimony of O'Brien and McCracken is, predominantly, admissible, GM's Motion for Summary Judgment as to the product defect claim is denied.[10]

      2. Failure to warn / inadequate warning claim

GM has also moved for summary judgment of Pitterman's failure to warn / inadequate warning claim. In support, GM argues that the "owner's manual that came with the [2004] Suburban plainly warned about the fact that the vehicle's BTSI did not cover the Accessory key position." GM's MFSJ Mem. in Supp. at 6. As to the adequacy of those warnings, GM argues that summary judgment should be granted in its favor because Pitterman has "not identified a single expert who has rendered a professional opinion about the sufficiency of [the] warnings" contained in the 2004 Suburban's owner's manual. Id. at 6. In response, Pitterman argues that, under Connecticut law, expert testimony is not required to prevail on an inadequate warning claim. See Pls.' MFSJ Opp'n at 14.

Under Connecticut law, "[e]xpert testimony is generally required in cases in which . . . the issues involved go beyond the field of the ordinary knowledge and experience of

---

[10] The portion of McCracken's product defect opinion that the court has excluded does not affect Pitterman's ability to prevail on his product defect claim, for the precise reason already explained in footnote 8.

the trier of fact." D'Ascanio v. Toyota Indus. Corp., 309 Conn. 663, 674 (2013) (internal

quotation marks omitted).  Here, the issue is whether what GM characterizes as

"warnings" contained in the owner's manual were sufficient to adequately warn drivers

that the BTSI was not active in the Accessory position and that, as a result, the

transmission could be shifted without application of the brake, if the key is in the

Accessory position.  The parties have not cited, nor is the court aware of, any case in

which a court applying Connecticut law has held that expert testimony is required, as a

matter of law, in order for a plaintiff to prevail on an inadequate warning claim.

GM has not carried its burden of proving that expert testimony is required for

Pitterman to prove that the "warnings" contained in the owner's manual were

inadequate.  There is no dispute that the BTSI was not active in the Accessory position

in the 2004 Suburban.  It is not complicated for a layperson to understand what the

BTSI does.  Nor is it complicated for a layperson to understand that, in cars in which the

BTSI function is not active in the Accessory position, the transmission can be shifted

without application of the brake if the key is in the Accessory position.  Given these

easily comprehensible concepts, asking a layperson to determine whether the

"warnings" contained in the owner's manual adequately warned against the possibility of

the transmission being shifted without application of the brake while the key was in the

Accessory position does not go "beyond the field of the ordinary knowledge and

experience."  Id.

The two cases cited by GM in support of its argument that expert testimony is

required for Pitterman to prove his inadequate warning do not require a different

conclusion.  In White v. Mazda Motor of America, Inc., 139 Conn.App. 39 (Conn. App.

Ct. 2012), the court mentions the plaintiff's failure to warn claim, but does not discuss it substantively, nor does the court substantively discuss the need for expert testimony to prove that claim.  The lower court also did not substantively discuss this issue.  See White v. Mazda Motor of America, Inc., No. HHDCV086003322S, 2011 WL 3211221, (Conn. Super. Ct. June 22, 2011).

The other case cited in support by GM – Montagnan v. Pfizer, Inc., 584 F.Supp.2d 459 (D. Conn. 2008) – is easily distinguishable from this case.  In Montagnan, the plaintiff claimed that the warning accompanying the drug Depo-Provera was inadequate because it did not incorporate the results of studies conducted in 1991 and 1999.  See id. at 462.  However, in Montagnan it was unclear, as a threshold matter, whether the results of the 1991 and 1999 studies should have been incorporated in the first place.  See id. at 463 ("neither the Court nor a lay jury is capable of assessing the credibility of the 1991 and 1999 Studies, synthesizing the results of the studies (which do not plainly state any of the proposed warnings), or comparing the results of these studies with other studies that came to contrary conclusions").  That is not the case here.  There is no argument made by GM that the 2004 Suburban's owner's manual did not need to include a warning against the risks associated with having a BTSI function that was not active in the Accessory position on the ground that those risks were unfounded.  The 1990 NHTSA Report clearly established the link between a BTSI function that was not active in all positions and the risk of rollaway accidents.

Rather, the question here is much more straightforward: given the known risks associated with having a BTSI function that was not active in the Accessory position, did

the "warnings" included in the owner's manual adequately warn users against those

risks.  The court concludes that it would not go "beyond the field of the ordinary

knowledge and experience" to ask a layperson – who has been informed of the risks

associated with a BTSI function that was not active in the Accessory position – to look

at the "warnings" contained in the owner's manual and determine if those "warnings"

were sufficient.  Accordingly, Pitterman is not required to proffer expert testimony

regarding the adequacy of the warnings, and GM's Motion for Summary Judgment as to

the failure to warn / inadequate warning claim is denied.

## V.      CONCLUSION

For the above-stated reasons, GM's Motion to Exclude O'Brien's expert

testimony  (Doc. No. 63) is **DENIED**.  GM's Motion to Exclude McCracken's expert

testimony (Doc. No. 65) is **GRANTED IN PART AND DENIED IN PART.**  It is granted to

the extent that McCracken cannot testify about GM's ability to retrofit the 2004

Suburban.  In all other respects, it is denied.  GM's Motion for Summary Judgment

(Doc. No. 59) is **DENIED**.

Because the court did not rely on Exhibit O to Doc. No. 95 in reaching any of the

decisions discussed in this Ruling, GM's Motion to Strike Plaintiffs' Exhibit O (ECF 05-

15) on Summary Judgment Motion (Doc. No. 103) is **TERMINATED AS MOOT.**

**SO ORDERED**.

Dated at New Haven, Connecticut this 29th day of April 2016.


/s/ Janet C. Hall_____
Janet C. Hall
United States District Judge